UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------X

UNITED STATES OF AMERICA　　　:

　　　-against-　　　　　　　　　:　　　13 CR 0527 (WFK)

ALHASSANE OULD MOHAMED　　:

　　　Defendant.　　　　　　　　:

----------------------------------------------X

**MEMORANDUM OF LAW AND FACT IN SUPPORT OF THE
DEFENDANT'S MOTION TO VACATE OR, IN THE
ALTERNATIVE, MODIFY SPECIAL ADMINISTRATIVE
MEASURES**

> DOUGLAS G. MORRIS, ESQ.
> MILDRED WHALEN, ESQ.
> FEDERAL DEFENDERS OF NEW YORK, INC.
> ONE PIERREPONT PLAZA, 16TH FLOOR
> BROOKLYN, N.Y. 11201
>
> ATTORNEYS FOR DEFENDANT
> ALHASSANE OULD MOHAMED

DATED:　　BROOKLYN, N.Y.
　　　　　JANUARY 29, 2015

CC:　　ASSISTANT U.S. ATTORNEY ZAINAB AHMAD

　　　ASSISTANT U.S. ATTORNEY CELIA COHEN

　　　ASSISTANT U.S. ATTORNEY SAMUEL NITZE

　　　CLERK OF THE COURT

　　　MR. ALHASSANE OULD MOHAMED

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------X

UNITED STATES OF AMERICA    :

     -against-                :     Memorandum of Law and Fact

ALHASSANE OULD MOHAMED   :     13 CR 0527 (WFK)

     Defendant.            :

-----------------------------------------------X

## MEMORANDUM OF LAW AND FACT IN SUPPORT OF THE DEFENDANT'S MOTION TO VACATE OR, IN THE ALTERNATIVE, MODIFY SPECIAL ADMINISTRATIVE MEASURES

### Preliminary Statement

The government has relegated our client, Mr. Alhassane Ould Mohamed, to extreme solitary confinement under so-called "SAMs," or Special Administrative Measures. Words cannot capture the horrors of such solitary confinement. It jeopardizes Mr. Mohamed's sanity and risks creating his incompetence. To what end? The government claims that Mr. Mohamed is violent and has terrorist connections – serious matters indeed. Yet its allegations fall short on one issue after another, in showing that Mr. Mohamed's connections to designated terrorist groups are as significant as the government implies, that he is likely (or would be able) to carry out acts of violence while in custody, or that the SAMs accomplish their stated purpose of averting dangers. While serving little purpose, the SAMs create an obstacle course to counsel's ability to represent Mr. Mohamed.

The SAMs are unlawful. They include restrictions on the defense as well as the defendant but ignore the regulatory authority for such defense restrictions. They are also unconstitutional.

2

They violate Mr. Mohamed's Sixth Amendment rights to have effective assistance of counsel, develop a defense, and conduct a meaningful investigation; his Fifth Amendment right to due process; and his First Amendment right to free speech.

The government has failed to cure the many defects in the SAMs, even though it has made one favorable modification and the United States Attorney's Office has interpreted some (albeit not all) provisions in ways that meet defense objections. But the defense still operates at the risk that another part of the government or a court might interpret provisions differently. Furthermore, other government interpretations are either unclear or unsatisfactory. Ultimately, all parties need to work from a document that is not obscure and ambiguous, as these SAMs often are, but is clear on its face.

For these reasons, as detailed below (as well as in a defense letter to the government of October 8, 2014, incorporated by reference), the defense moves to vacate the SAMs in full, to release Mr. Mohamed from the SHU, and to place him in the general prison population. If the Court were to deny that motion, the defense moves, in the alternative, to vacate and/or modify various sections and provisions of the SAMs.[1]

---

[1] The defense also frames its request for relief in the alternative as a petition for a writ of habeas corpus, pursuant to 28 U.S.C. §2241.

This submission refers to the attached Exhibits A-Z and AA-BB. We attach the defense letter of October 8, 2014, as Exhibit D. This submission uses the following abbreviations:

BOP:      Bureau of Prisons,
FDNY:     Federal Defenders of New York, Inc.,
MCC:      Metropolitan Correctional Center,
PLRA:     Prison Litigation Reform Act,
SAMs:     Special Administrative Measures,
SHU:      Special Housing Unit, and
USAO:     United States Attorney's Office for the Eastern District of New York.

## BACKGROUND

1. __The Chronology of the Crime, Arrest, and SAMs Is Straight-Forward.__

On December 23, 2000, a car-jacking in Niamey, Niger, of a Toyota Land Cruiser, resulted in the homicide of William Bultemeier, deployed to the U.S. Embassy, and the severe injury of Christopher McNeely, a Marine Corps Staff Sergeant stationed there. Almost thirteen years later, on September 13, 2013, the USAO obtained a two-count indictment in the Eastern District of New York charging Mr. Mohamed with the murder of an internationally protected person (Count 1), and the attempted murder of an internationally protected person (Count 2). Two months later, on November 25, 2013, French forces in northern Mali arrested Mr. Mohamed, eventually handing him over to Malian authorities. Three-and-a-half months later, on March 12, 2014, Mr. Mohamed was arrested by FBI agents, flown to the U.S., and arraigned on the Indictment. The BOP confined him in the SHU at the MCC.

On July 15, 2014 – almost eight months after French forces had arrested Mr. Mohamed and more than four months after the U.S. had taken him into custody – the U.S. Attorney General issued SAMs governing Mr. Mohamed's conditions of confinement (Ex. A). The Attorney General modified the SAMs twice, on November 14, 2014 (Ex. B), and December 12, 2014 (Ex. C). The defense presented detailed objections to the government in a letter of October 8, 2014 (Ex. D). Furthermore, the defense proposed easing the harsh conditions of confinement through a series of practical steps developed by a professional social worker, Ms. Vivianne Guevara, Director of Client

and Mitigation Services at FDNY (Ex. E). The USAO did not respond to the defense object ions of

October 8 until November 14, 2014 (Ex. F), and ignored Ms. Guevara's proposals altogether.[2]

**2.     The SAMs Are Not Justified by the Government's Allegations and Fail to Advance their Stated Purposes.**

The government alleges that the SAMs hinder Mr. Mohamed from engaging in

communications that may result in harm to others – a necessary precaution because of his

connections with terrorist organizations. But the government's allegations fail to show that Mr.

Mohamed presents a danger while in custody in the United States, even if he were in the general

population. While alleging his various associations, the government does not allege that he belonged

to designated terrorist organizations, was fanatically devoted to their cause, or could now motivate

any of them to act on his behalf in the United States. The SAMs simply do not address the dangers

that the government fears.

*a.     The Purposes that the Government Claims the SAMs Serve*

The SAMs state that they serve the purpose of avoiding a "substantial risk that [Mr.

Mohamed's] communications or contacts with persons . . . result in death or serious bodily injury

to persons . . . . " (Ex. A, at 1; see also id. at 4 [the SAMs are "appropriate" because of "the

likelihood that Mohamed may attempt to use his terrorist connections to retaliate against government

witnesses . . . . "]; id. at 5 [referring to "the SAM's intent of significantly limiting the inmate's ability

to communicate . . . information with intent to harm others."]; id. at 11 [indicating that the SAMs

should keep the inmate from discussing "illegal activity" or "the soliciting of or encouraging of acts

of violence . . . . "]; id. at 14 [similar to p. 11]; id. at 17 ["The SAMs . . . are reasonably necessary

---

[2] For the Court's convenience, we are attaching a document that we have created juxtaposing the defense objections of October 8 with the USAO's responses of November 14 (Ex. G).

to prevent the inmate from committing, soliciting, or conspiring to commit additional criminal activity."]; see also Ex. F, at 1.)

        *b.*    *The Reasons Why Mr. Mohamed's Alleged Terrorist Ties Should Not Bear on his Present Conditions of Confinement*

The substantial risk of violence that concerns the government does not arise from the two indicted crimes. Murder and attempted murder are grave crimes, to be sure, but they alone do not typically justify SAMs. Rather the government alleges that Mr. Mohamed has engaged in several acts of violence, including the murder of four Saudi nationals in 2009, and has terrorist connections (Exs. A, at 3-4; B, at 1-2). But a close inspection of the government's allegations show that Mr. Mohamed's purported terrorist connections are weaker and their significance and potential for future danger less than the government suggests. Ultimately, the allegations cannot justify the SAMs.

The government's underlying allegations fail to support its position that Mr. Mohamed is dangerous while in American custody. The government alleges that he has connections with six groups: (i) the National Movement for the Liberation of Azawad ("MNLA"); (ii) al-Qaeda in the Islamic Maghreb ("AQIM"); (iii) Movement for Unity and Jihad in West Africa ("MUJAO"); (iv) al-Mulathamun Battalion; (v) al-Murabitoun; and (vi) Boko Haram (Ex. A, at 3-4). The list is troubling. But the government fails to allege that Mr. Mohamed's connections to these groups are significant.

The government links Mr. Mohamed most closely to the MNLA. It asserts that he is an MNLA member and that he "was traveling with three armed members of the Azawad Movement" when he was arrested in 2013 in Mali (Ex. A, at 3). Yet the MNLA stands apart from the five other groups. The MNLA is the one group among them that the U.S. State Department has not designated

6

as a foreign terrorist organization.[3] Furthermore, the MNLA is pursuing secular political goals within Mali rather than a fanatical religious vision for the world (see Ex. X). The MNLA consists of Tuareg, a group of semi-nomadic pastoralists of North African Berber origin who live in the western and northern Sahara. While the government describes the Azawad movement as "a violent rebel group that has waged multiple attacks on the governments of Mali and Niger," (Ex. A, at 3), the movement is a separatist one with local grievances and does not aim its wrath at the United States. Thus, Mr. Mohamed's alleged connections with the MNLA provide little basis for fearing that he is dangerous while in American custody.

Allegations that Mr. Mohamed has connections with four other groups – AQIM, al-Mulathamun Battalion, MUJAO, and al-Murabitoun – are more chilling. But the government relies on "guilt by association," not evidence that Mr. Mohamed belonged to these groups. According to the government, Mr. Mohamed has "previously admitted that he knows Mokhtar Belmokhtar, a former leader in AQIM[,] who currently leads the al-Qaeda controlled designated terrorist group, al-Mulathamun Battalion," and stated in a post-arrest interview by FBI agents "that he was very close with leaders of the designated terrorist group MUJAO in Mali and Niger, many of whom he had known since childhood (although he claimed not to have had recent contact with them)." (Ex. A, at 3.) The government makes no allegation that Mr. Mohamed had links to al-Murabitoun, only that the group arose in August 2013 from a merger between MUJAO and the al-Mulathamun Battalion (Ex. A, at 3-4). Presumably to illustrate how dangerous these four groups are, the government refers

---

[3] See http://www.state.gov/j/ct/rls/other/des/123085.htm. The first modification of the SAMs of November 14, 2014, is wrong in indicating otherwise (cf. Ex. B, at 2).

to their responsibility for at least six specific terrorist attacks and kidnappings – but it never claims that Mr. Mohamed participated in any of these particular crimes (see Ex. A, at 3).

The government suggests that Mr. Mohamed is dangerous because of his alleged contacts with these four groups – AQIM, al-Mulathamun Battalion, MUJAO, and al-Murabitoun – as well as Boko Haram. But the government's allegations show that he is less dangerous than the groups themselves. These five groups consist of Islamist militants (see Ex. Y). But the government does not allege that Mr. Mohamed belonged to any of them. Nor does the government allege that he acted as a leader for these or any other groups, that he drew in followers, that he personally has pursued a political or ideological agenda, or that he is a religious fanatic. In fact, nothing in the discovery produced by the government suggests that Mr. Mohamed is either political, ideological or religious. Thus, the government has neither alleged nor produced evidence that Mr. Mohamed, whatever his alleged contacts with these five groups, shares their fanatical political, ideological or religious goals.

      *c.*     *The Reasons Why the SAMs Do Not Serve their Stated Purpose*

The government's allegations fail to show not only that Mr. Mohamed is an Islamic militant but also that he could use connections to any militant group to present a danger while in American custody. The SAMs claim or imply that their severe restrictions on Mr. Mohamed prevent three dangers. Each such claim is ill-founded.

First, the SAMs imply that their restrictions might prevent a jail-break. The government alleges that Mr. Mohamed has escaped from custody twice: once in May 2002, when he escaped Malian custody "during a medical visit," and, more recently, in June 2013, when he escaped Nigerien custody when "[s]everal inmates, including Mohamed, launched an assault that was coordinated with armed militants outside of the prison and spearheaded by the terrorist group Boko Haram . . . ." (Ex.

A, at 2-3.)  While these allegations are serious, they fail to show that Mr. Mohamed could carry out a jail-break an ocean away from northern Africa in New York City.  The operational possibilities for a terrorist group like Boko Haram hardly exist in the United States, which is totally different from Niger, a poverty-stricken country with weak institutions, wide-spread corruption, and large numbers of individuals susceptible to religious fanaticism.  Equally important, the U.S. State Department summary of the activities of designated foreign terrorist organizations gives the location and area of operation of Boko Haram as northern Nigeria, northern Cameroon, and the Lake Chad Basin (Ex. Z).  The State Department summary does not state, nor does the government present any evidence, that Boko Haram has ever targeted, undertaken any acts in, or even exists in either the United States or New York City.

Second, the SAMs state that their restrictions protect potential government witnesses (Ex. A, at 4 [the SAMs are "appropriate" because of "the likelihood that Mohamed may attempt to use his terrorist connections to retaliate against government witnesses . . . ."]; see also Ex. F, at 1).  The logic is baffling.  If Mr. Mohamed actually committed the indicted crimes and wished to retaliate against potential witnesses, he had more than a decade to have done so.  Yet the government has made no such allegations.  If concerned about witnesses previously unknown to Mr. Mohamed, the government should seek a protective order.

The government only hints at its third and maybe strongest argument: groups that it has mentioned and that the U.S. State Department has designated as foreign terrorist organizations – AQIM, al-Mulathamun Battalion, MUJAO, al-Murabitoun, and Boko Haram (Ex. A, at 3-4) – might commit terrorist acts, such as taking Western hostages, for the purpose of procuring Mr. Mohamed's release.  The argument suffers two flaws.  First, if any of these groups wanted to commit crimes on

9

Mr. Mohamed's behalf, they do not have to await a message from him. French, Malian and American authorities have made both his arrest and prosecution public. Second, nothing has happened since Mr. Mohamed's most recent arrest to indicate that any of these groups seek his release. On the contrary, the groups did nothing when French forces arrested him in November 2013, when Malian authorities held him in custody for almost four months, and when the federal BOP held him in custody for more than four months before the imposition of the SAMs.

In short, the SAMs fail to make a factual showing that Mr. Mohamed presents a danger or that their restrictions accomplish their stated goals.

### 3.   The SAMs Subject Mr. Mohamed to Inhumane Conditions of Extreme Solitary Confinement.

Whatever the justification for the SAMs, they impose conditions of confinement that are draconian. Filled with apparent boilerplate lifted from other SAMs for totally different defendants, they elide Mr. Mohamed's specific circumstances. They ignore the well-documented agonies of solitary confinement. Yet the government has resisted workable modifications that would not interfere with the SAMs' purported goals. The USAO has written us that it "understands that the BOP has already taken steps to address your concern that the defendant is unduly isolated," (Ex. F, at 5), but we cannot fathom what it has in mind. The government avoids solutions while Mr. Mohamed's extreme solitary confinement continues unabated.

#### a.   The Conditions of Mr. Mohamed's Confinement

The government confines Mr. Mohamed to a small cell for most of every day, offers him no opportunity for exercise, and cuts him off from almost all human communication. His cell is small and cramped. He gets food slipped in through a slot in the door, and he eats alone. A light is always

on. With variable air-conditioning, he has often lacked warm enough clothing and been cold. He never goes outside. He gets no exercise. For an hour per day he goes down the hall to another room, the size of a dog run, which is empty, bare, and without exercise equipment or even a mat on the floor. The defense asked the government for a tour or, at least, photos – which we could have shown the Court – but, even with a protective order, the government refused (see Ex. K, at 1-4).[4]

The government has failed to accommodate three of Mr. Mohamed's characteristics that render the already severe restrictions even worse.

First, Mr. Mohamed speaks no English. But the government has failed to set up a system for facilitating his communication with prison personnel, such as a weekly meeting with the assistance of an interpreter. Besides an occasional examination by a French-speaking doctor, Mr. Mohamed must communicate with guards through gestures. The BOP reports, according to the USAO, that "mental health and other staff visit the defendant regularly and make it a point to enlist the aid of an Arabic- or French-speaking staff member," (Ex. F, at 5), but that pollyannaish account has not been Mr. Mohamed's experience. When prison employees have attempted some French or Arabic, he has had difficulty understanding them because their language skills were too weak or their dialect too different.[5]

---

[4] In regard to Mr. Mohamed suffering from the cold, the defense has met the Court's directive at the status conference on December 10, 2014, to work with the government to resolve the issue. The government has recently assured us that Mr. Mohamed "currently has thermal underwear and four blankets (two of which are wool)." (Ex. AA.) While we hope that the issue is resolved, we continue to ask the Court to order the government to provide him with sufficient clothing and bedding – all the time.

[5] In regard to Mr. Mohamed's tremendous difficulty in communicating with English-speaking correctional offices, the defense tried to work with the government to resolve the issue, as the Court directed at the status conference on December 10, 2014, but is not satisfied that the government has adequately addressed the issue. The government has just represented to us that Mr. Mohamed

Second, Mr. Mohamed is semi-literate at best (see Ex. U, at 2). But the government has failed to provide him with daily activities to keep him occupied. We may live in an electronic age, but the government has failed to provide Mr. Mohamed with a television or computer screen for viewing films, news reports, or other images. The USAO has written us that "BOP staff has provided the defendant with picture language books." (Ex. F, at 5.) In fact, BOP staff provided him with only one book after months of waiting. Defense counsel has struggled to fill the void, only to meet bureaucratic obstacles. The MCC has prohibited counsel from dropping off books and magazines (Ex. R). Instead, they must come directly from the publishers (Ex. R). But the MCC mail room reported "that the magazines had not been coming in as they were rejected at the post office for not having Mr. Mohamed's inmate register number on the mailing label." (Ex. S.) Despite our best efforts, dating back to April 2014, Mr. Mohamed did not receive his first book until early December 2014. While defense counsel was able to provide him with money for purchasing a radio through the commissary, he could not get channels in a language he understood and the batteries soon died anyway.

Third, Mr. Mohamed has no family, friends or contacts in the United States. The restrictions on his non-legal visits (see Ex. A, §3.f.) may be the least of his worries since he would never get

---

"ordinarily has contact with a French or Arabic speaker at least once per week." (Ex. AA.) We do not know whether the government is referring to the weekly meetings that defense counsel has had with Mr. Mohamed. We conduct those meetings not only to have the consultations necessary in any legal representation but also to do our best to assure that Mr. Mohamed has simple human interactions, which the SAMs have rendered so difficult. If the government is referring to contact arranged by the MCC, it exaggerates what constitutes "ordinary" and what constitutes "contact." The defense continues to request regularly scheduled weekly meetings arranged by the MCC to facilitate Mr. Mohamed's clear and unambiguous communications to the staff of his needs.

such visits anyway.  But the government has failed to compensate.  It has failed to set up a system in which he might regularly have human contact.

Isolated in a cell, inactive, deprived of human contact, Mr. Mohamed has lacked appropriate medical care.  He has a documented history of pulmonary disease (Exs. I, J).  Nonetheless, MCC's own medical records show that its medical staff communicated with him using hand symbols and conducted so-called medical evaluations through his cell's glass windows (Ex. I, and its attached Exs. A, B; see also Ex. U, at 3 [Dr. L. Thomas Kucharski, who examined Mr. Mohamed, is unclear how MCC's Psychology Services "can effectively conduct the monthly psychological assessments required for all inmates housed in SHU for Mr. Mohamed."]).  Despite his pulmonary history and his affliction with sinus, chest and breathing problems, the MCC has regularly failed to provide him with sufficiently warm clothes and bedding (e.g., Exs. I, J).

Mr. Mohamed has already at times suffered symptoms arising from solitary confinement, including auditory hallucinations, short-term memory loss and trouble sleeping (see Ex. U, at 2; see also id. ["Efforts to reduce the extreme isolation experienced by Mr. Mohamed would potentially decrease the possibility that his psychological functioning would deteriorate."]).

As defense counsel, we can describe the conditions of Mr. Mohamed's confinements only with our words.  But his conditions of confinement are beyond words – which alone cannot capture the agony of his confinement.

b.      The Inhumanity of Prolonged Solitary Confinement

The government has failed to tailor the conditions of Mr. Mohamed's confinement to his unique circumstances, leaving him instead to vegetate.  It ignores the dangers that solitary

13

confinement poses to a person's sanity. Those dangers are well-known. According to Dr. Stuart Grassian, of Harvard Medical School:

> [S]olitary confinement – that is confinement of a prisoner alone in a cell for all or nearly all of the day, with minimal environmental stimulation and minimal opportunity for social interaction – can cause severe psychiatric harm. This harm includes a specific syndrome which has been reported by many clinicians in a variety of settings, all of which have in common features of inadequate, noxious and/or restricted environmental and social stimulation. In more severe cases, this syndrome is associated with agitation, self-destructive behavior, and overt psychotic disorganization.

Stuart Grassian, "Psychiatric Effects of Solitary Confinement," a redacted version of a declaration submitted in September 1993 in Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal., 1995);[6] see also Laura Rovner and Jeanne Theoharis, "Preferring Order to Justice," 61 Am. U. L. Rev. 1331, 1358-1371 (June 2012)(summarizing the literature and cases on the effects of SAMs-imposed isolation, including mental and physical harm and the deterioration in a client's ability to assist in his own defense); Atul Gawande, "Hellhole," *The New Yorker* (March 30, 2009); S. Grassian, "Psychiatric Effects of Solitary Confinement," 22 Washington University Journal of Law and Policy 325-383 (2006);[7] C. Haney, "Mental health issues in long-term solitary and 'supermax' confinement." 49 Crime and Delinquency 124-156, 132 (2003)("[T]here is not a single published study of solitary . . . confinement in which nonvoluntary confinement lasting for longer than 10 days . . . failed to result in negative psychological effects. The damaging effects ranged in severity and included such

---

[6]

http://www.probono.net/prisoners/stopsol-reports/417726.Psychiatrict_Effects_of_Solitary_Confinement_1993.

[7]

http://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1362&context=law_journal_law_policy.

clinically significant symptoms as hypertension, uncontrollable anger, hallucinations, emotional

breakdowns, chronic depression, and suicidal thoughts and behavior.")  The United Nations has

described solitary confinement as a form of torture. <u>See</u> United Nations, "Interim Report of the

Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading

Treatment or Punishment" (2011);[8] <u>accord</u> Human Rights Watch, Submission to the United Nations

Committee against Torture (2014).[9]

In Congressional testimony in the winter of 2014, Mr. Charles Samuels, Jr., BOP's Director,

acknowledged the hazards of solitary confinement and provided assurances that the BOP avoided

them.  He stated:

> Inmates placed in restrictive housing are not "isolated" as that term
> may be commonly understood. . . . In most circumstances, inmates
> placed in restrictive housing are able to interact with other inmates
> when they participate in recreation and can communicate with others
> housed nearby. They also have other opportunities for interaction
> with family and friends in the community (through telephone calls
> and visits), as well as access to a range of programming opportunities
> that can be managed in their restrictive housing settings.[10]

Unfortunately, these reassurances do not apply to Mr. Mohamed.  Under the SAMs, he has

no access to "programming opportunities," he may not "interact with other inmates when they

---

[8]
http://www.ohchr.org/Documents/HRBodies/HRCouncil/Regularsession/Session22/A.HRC.22.5
3_English.pdf.

[9] http://www.hrw.org/news/2014/10/20/submission-united-nations-committee-against-torture.

[10] Statement of Charles E. Samuels, Jr., Director, Federal Bureau of Prisons, before the
Subcommittee on the Constitution, Civil Rights, and Human Rights Committee on the Judiciary,
United States Senate for a Hearing on Reassessing Solitary Confinement: The Human Right, Fiscal,
and   Public   Safety   Consequences,   on   February   24,   2014,   retrieved   from
http://www.judiciary.senate.gov/imo/media/doc/02-25-14SamuelsTestimony.pdf.

participate in recreation," he may not "communicate with others housed nearby," and he has had no opportunity "for interaction with family and friends in the community" through either phone calls or visits.

In short, Mr. Mohamed faces all the evils of prolonged solitary confinement.

    *c.*    *Practical Proposals by the Defense on Improving Mr. Mohamed's Conditions of Confinement*

There is no good reason why Mr. Mohamed must suffer the harsh conditions of extreme solitary confinement. The government has never followed through on its belated nod at improvement months ago that "the education staff at the MCC are exploring whether any additional activities can be made available to the defendant . . . . " (Ex. F, at 5.) Nor has the government responded, let alone implemented, the defense's earlier, concrete proposals (see Ex. E). Ms. Vivianne Guevara of FDNY has developed a set of structured activities that are practical and doable. They include activities that Mr. Mohamed could undertake alone on a regular schedule and others that would provide educational and vocational opportunities in groups while not requiring Mr. Mohamed to speak English or to talk with others.

Such activities include the following:

| | |
|---|---|
| **Activities in Solitary Confinement** | <ul><li>Television</li><li>Books with pictures</li><li>Self-guided language classes</li><li>Self-guided English classes</li><li>Exercise in larger spaces</li><li>Regularly scheduled visits with mental health or French/Arabic speaking staff</li></ul> |
| **Activities Involving Verbal Instructions but not Requiring Talking with Others** | <ul><li>Yoga</li><li>Chess</li><li>Receiving instruction in a sport</li><li>One on one basketball</li></ul> |

17

| | |
|---|---|
| **Existing MCC Activities in the General Population** | *Mental Health*<br>• Paint/Color-by-Number<br>• Drawing<br>• Guitar Instruction<br>• Yoga<br>• Chess<br>• Adult Continuing Education (ACE)<br><br>*Physical Health*<br>• Structured Activity Programs—Roof recreation<br>• Physical Assessments —Body weight, body fat, etc.<br>• "At Risk" health assessments, multi-disciplinary |

Defense counsel has also proposed working with the government "to find a mutually agreeable charitable organization that can send precleared volunteers on a regular schedule to visit Mr. Mohamed for the purpose of conversations and activities unrelated to the case or politics." (Ex. D, at 9.)

While continuing discussions with the government, defense counsel is formally moving that the MCC provide Mr. Mohamed a weekly meeting with its staff with an interpreter who speaks either French or Mr. Mohamed's dialect of Arabic (see fn. 5 supra). Mr. Mohamed has told Dr. L. Thomas Kucharski, who has examined Mr. Mohamed, "that he is not able to communicate effectively with staff . . . . " (Ex. U, at 3.) Dr. Kucharski thinks that "assigning staff, particularly medical or psychology staff who can communicate with Mr. Mohamed, would . . . be helpful." (Id.)

The government's inflexibility arises in part from its own design. The first substantive provision of the SAMs states that whenever the SAMs and BOP regulations conflict, the more restrictive one governs (Ex. A, §1.a., p. 4). The guiding light is severity, nothing else. The logic of

18

the SAMs is to eliminate options, not to allow new ones for new circumstances. The government has unilaterally decided that regulations crafted for the ordinary circumstances of prison life will block solutions to problems created by the extraordinary circumstance.

In short, the government has ignored the defense proposals for structured activities and regulated visits, even though their implementation would neither be burdensome nor interfere with the stated purposes of the SAMs.

d.      *The Significance of One Incident Report*

A person in solitary confinement, subject to sensory deprivation and utter inactivity, might well try to occupy himself through human contact. Mr. Mohamed is no different. In mid-October the BOP sanctioned him for what he has described, plausibly, as a game but the government has described, unconvincingly, as sinister.

On October 18, a BOP guard "heard talking and unusual noises from cells #4 and #5," approached, and

> observed an orange string attached to two empty toothpaste tubes, which were cut in half, being pulled into cell #5 by inmate Mohamed . . . . [T]he toothpaste tubes contained cut pieces of paper with writing and a ripped piece of cardboard from a toilet paper roll. . . . [The other inmate] . . . claimed that it was just a game.

(Ex. L; see also Ex. BB.) Mr. Mohamed also said that the two "were just playing," and "[i]t was only a game." (Ex. L.) On Oct. 22, 2014, the MCC's Unit Discipline Committee found that Mr. Mohamed committed two prohibited acts and sanctioned him with the loss for six months of both commissary and social phone calls (id.). On November 21, MCC's Warden reduced the sanctions to three months each (Ex. O; see also Exs. M, N).

19

The government has written us that our "suggestion that there is no reason to believe that the defendant would or could pass messages to other inmates is belied by his recent efforts to do just that . . . ." (Ex. F, at 4.) This government assertion finds no support in the BOP's Incident Report. The Report alleges that another inmate was passing an item to Mr. Mohamed, not vice versa (see Ex. L). It alleges that the items, halves of toothpaste tubes, contained "a ripped piece of cardboard from a toilet paper roll," and "cut pieces of paper with writing," but does not allege that the writing had any message. The government has just responded to the defense request for "copies of the 'cut pieces of paper with writing,' . . . and the opportunity to inspect . . . all items involved in the incident described in the Incident Report . . . ." (Exs. K, at 4-5; AA.) Apparently the contraband was so innocuous that the BOP discarded it (see Ex. AA). The photos provided by the government show scraps of paper that may contain print but not handwriting (see Ex. BB). As the government now admits, "no words or messages are or were discernible," and Mr. Mohamed "was charged with possession of an unauthorized item, not with unauthorized communication with other inmates." (Ex. AA.)

The allegations show that this incident involved what Mr. Mohamed stated: a game – doubtless one resulting from utter boredom.

In short, the SAMs impose on Mr. Mohamed extreme conditions of solitary confinement. They weigh down on him far more heavily than needed to accomplish the SAMs' stated goals. Nonetheless, the government has stubbornly refused to ease his harsh conditions and instead assaults his mental health and human dignity.

# ARGUMENT

## I.

## THE COURT HAS JURISDICTION TO GRANT RELIEF

As a threshold matter, the Court has jurisdiction to proceed on the defense motion to vacate or, in the alternative, to modify the SAMs. U.S. v. Hashmi, 621 F. Supp. 2d 76, 84-86 (S.D.N.Y. 2008)(holding that a federal pretrial detainee can move directly in district court for relief from SAMs); accord U.S. v. Savage 2010 WL 4236867, at *3-7 (E.D. Pa. Oct. 21, 2010); Sattar v. Gonzales, 2010 WL 685787, at *2 (D. Colo. Feb. 23, 2010); U.S. v. Lopez, 327 F. Supp. 2d 138, 140-42 (D.P.R. 2004). The defendant need not exhaust his administrative remedies, as he would have to for an action under the Prison Litigation Reform Act, see 42 U.S.C. §1997e(a), because the present motion is not an "action" within the meaning of the Act. Hashmi, 621 F. Supp. 2d at 85. Accordingly, the Court has jurisdiction.

The Court also has jurisdiction, pursuant to 28 U.S.C. §2241(c), because Mr. Mohamed is in custody under or by color of the United States and is committed for trial before the United States District Court for the Eastern District of New York, and because his present custody and confinement violates the Constitution and laws of the United States. The federal habeas corpus statute "draws no distinction between Americans and aliens held in federal custody . . . . " Rasul v. Bush, 542 U.S. 466, 481 (2004).

## II.

## THE SAMS ARE UNWARRANTED AND EXCEED REGULATORY AUTHORITY

**A.    Regulations Provide for Two Different Types of Restrictions.**

The regulatory basis for SAMs envisions two types of restrictions. See 28 C.F.R. §501.3. The first "ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges . . . as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." 28 C.F.R. §501.3(a). It requires "a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons . . . . " Id. The second type of restrictions is much narrower, in both its nature and cause. It permits "appropriate procedures for the monitoring or review of communications between that inmate and attorneys . . . who are traditionally covered by the attorney-client privilege," but only "where the Attorney General specifically so orders, based on information . . . that reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism . . . . " 28 C.F.R. §501.3(d).

Here the government puts severe limits on the defense even though the Attorney General does not invoke the second type of restrictions, i.e., even though the Attorney General does not claim any reasonable suspicion for believing that the defendant might use his attorneys "to further or facilitate acts of terrorism." Thus, the whole set of restrictions limiting the defense lacks any regulatory basis at all. The first type of restrictions is little better. It extends beyond "limiting certain privileges" to depriving Mr. Mohamed of the personal contacts and activities that any human being deserves.

**B.      The SAMs Restrictions on Counsel Are Not Authorized Under the Regulation.**

The regulatory basis for SAMs requires that restrictions on the Sixth Amendment be

supported by more than allegations that a defendant may engage in "acts of violence or terrorism."

Cf. 28 C.F.R. §501.3(a).  Rather, the government must articulate facts that show a "reasonable

suspicion" that, but for the SAMs, counsel would assist him in such heinous conduct. See 28 C.F.R.

§501.3(d).  Discussing the analogous situation of smuggling contraband into prison, the Seventh

Circuit stated:

> To justify his impairment of communication between attorneys and
> inmates in the name of security, a prison warden must come forward
> with facts which tend to support a reasonable suspicion not only that
> contraband is being smuggled to inmates in the face of established
> preventive measures, but that their attorneys are engaged in the
> smuggling.  We ground the last requirement on our unwillingness to
> assume that attorneys – admittedly the partisan advocates in court of
> their clients' cause – are more willing or more inclined to smuggle
> contraband past prison officials than are other outsiders who deal
> directly with inmates, as well as on our recognition of the
> constitutional importance of the business which an attorney typically
> conducts with an inmate . . . .

Adams v. Carlson, 488 F.2d 619, 631-32 (7th Cir. 1973).

Compared with any Sixth Amendment burdens, the regulation's first type of restrictions

"ordinarily" includes "administrative detention" and the curtailment of "certain privileges" that

involve daily living, such as "correspondence, visiting, interviews with representatives of the news

media, and use of the telephone . . . . " See 28 C.F.R. §501.3(a).  This first type of restrictions does

not encroach upon the defense.  Indeed, a defendant's communication with counsel is not a mere

"privilege"; it is a fundamental right guaranteed by the Sixth Amendment. See generally Geders v.

23

U.S., 425 U.S. 80, 91 (1976)(reversing and remanding because the trial court barred consultation between the defendant and his attorney during an overnight recess).

The regulation's distinction between legal representation and living conditions is stark. The second type of restrictions, which impairs attorney-client communications, specifically requires the Attorney General to make a finding that "reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism . . . . " 28 C.F.R. §501.3(d). The defect in the present SAMs is that they invoke the first but not the second type of restrictions. The Attorney General has not issued a specific order based on an alleged reasonable suspicion that Mr. Mohamed may use attorney-client communications "to further or facilitate acts of terrorism." But they significantly restrict the attorney-client relationship anyway.

The second section of the SAMs here imposes wide-ranging restrictions on defense counsel (see Ex. A, §2, pp. 5-10). It limits which defense team members may meet with Mr. Mohamed or may meet with him alone (e.g. id., §2.a. n.2., p. 6; §2.b.ii., p. 7; §§2.e. & f., p. 7; §2.g.i., p. 8). It imposes case-by-case approvals for certain defense team members, making arbitrary distinctions between paralegals and investigators, and between FDNY employees and outside experts (id. §§2.e. & f., p. 7.). It bars defense investigators from meeting alone with Mr. Mohamed (id., §2.f.; Ex. P), except with case-by-case SAMs modifications (Ex. F, at 3).

While the USAO has provided some favorable interpretations, the second section of the SAMs still includes language that on its face is ambiguous. It insists that only lawyers may "disseminate the contents of the inmate's communication," (Ex. A, §2.d, p,. 7; see also id., §2.i., p. 10), leaving unclear whether other defense team members can make use of information originating

24

from the defendant (<u>but see</u> Ex. F, at 2; <u>see also</u> Ex. D, at 3-4). It never defines critical terms, such as "messages" (Ex. A, §2.a., pp. 5-6; <u>see also</u> Ex. D, at 2), and "the defense" (Ex. A, §2.d., p. 7). It may bar reviewing with the defendant "inflammatory material," even if produced in discovery or necessary for investigation (Ex. A, §2.h.i., p. 9; <u>but see</u> Ex. F, at 2; <u>see also</u> Ex. D, at 6-7). While the USAO states that the SAMs do not authorize the government to monitor privileged attorney-client communications (Ex. F, at 3), the ambiguous formulations in the SAMs are open to other interpretations (<u>see</u> Ex. A, §2.g.ii.(3)(a), fn. 4, p. 8; §2.g.ii.(3)(d), fn. 5, p. 9; <u>see also</u> Ex. D, at 5-6).

The government has imposed these defense restrictions even though it has not tried to show that Mr. Mohamed would, or could, use his attorneys "to facilitate acts of terrorism," or any other acts that "would entail the risk of death or serious bodily injury to persons." 28 C.F.R. §501.3. At the risk of stating the obvious, the Court has appointed defense attorneys, and neither they nor their staff previously knew their client. The government has presented no evidence that Mr. Mohamed, who is illiterate or semi-literate at best, has tried to pass on messages, use code, or manipulate his attorneys. To the government's credit, it has not even speculated about defense counsel facilitating acts of terrorism. Such speculation, like the utter lack of evidence, would not give rise to reasonable suspicion.

Despite the lack of regulatory authority, these restrictions and ambiguities put defense counsel in the unenviable position of representing their client at risk of their own prosecution. Should they recoil from taking steps that effective counsel would ordinarily take in fear of violating ambiguities in the SAMs? Should they rely on the USAO's interpretations only to learn later that a court disagrees?

In short, since the second section of the SAMs has no basis at all in the regulations or in fact, and unlawfully burdens the right to counsel, the Court should vacate it.

## C.    The SAMs Imposed on Mr. Mohamed are Not Prisoner-Specific.

SAMs must be "prisoner-specific; that is, each prisoner upon whom SAMs are imposed has a set of SAMs issued for him, and him alone, based on the circumstances of his case." See U.S. v. Reid, 214 F. Supp. 2d 84, 87 (D. Mass. 2002). But the SAMs imposed on Mr. Mohamed are not prisoner-specific. Instead, they are virtually identical to those imposed upon other defendants – ones whose circumstances were qualitatively different. See e.g., U.S. v. Stewart, 590 F.3d 93 (2nd Cir. 2009); In re Basciano, 542 F.3d 950 (2nd Cir. 2008), and Ex. V; U.S. v. Tsarnaev, No. 13-CR-10200-GAO (D. Mass. 2013), and Ex. W.

In the well-known case involving Lynne Stewart, the Attorney General imposed a set of SAMs on Sheikh Omar Ahmad Ali Abdel Rahman. U.S. v. Stewart, 590 F.3d 93, 101-03 (2nd Cir. 2009). He was a spiritual leader of a violent Islamic terrorist group and gave religious opinions to his followers on whether their proposed acts of violence were holy and in furtherance of *jihad*. Id. at 101. He blatantly violated the SAMs, including soliciting his attorney, Lynne Stewart, to publicly disseminate messages calculated to incite violence. Id. at 103-108.

The SAMs imposed on Abdel Rahman were virtually identical to those here. See U.S. v. Stewart, 590 F.3d 93, 102-03 (2nd Cir. 2009). But unlike Abdel Rahman, Mr. Mohamed is not a spiritual leader, is not in a position of authority, does not claim religious sanction, and does not command a following. Furthermore, unlike Abdel Rahman, Mr. Mohamed has not tried to pass on messages surreptitiously to outsiders or the news media.

26

Another case with SAMs almost identical to those here involved the Italian mob boss Vincent Basciano. In re Basciano, 542 F.3d 950 (2nd Cir. 2008), and Ex. V. Basciano was convicted of various racketeering-related offences, including murder. Id. at 952. The Attorney General imposed SAMs after Basciano tried to recruit a fellow inmate for sneaking out a message that included a "hit list," naming cooperating witnesses, an Assistant U.S. Attorney, and even the presiding Judge, the Honorable Nicholas Garaufis of the United States District Court for the Eastern District of New York. Id. at 953.

Mr. Mohamed's circumstances are as different from Basciano's as they were from Abdel Rahman's. Unlike Basciano, Mr. Mohamed has not been trying to maneuver others into assisting his own criminal syndicate. Nor has Mr. Mohamed threatened anyone, let alone drawn up and handed on a "hit list." The government has not alleged that since his most recent arrest Mr. Mohamed has engaged in any criminal conduct at all.

The government also imposed SAMs almost identical to those here on the alleged Boston bomber Dzhokhar Tsarnaev. U.S. v. Tsarnaev, No. 13-CR-10200-GAO (D. Mass. 2013), and Ex. W. The government has alleged that Tsarnaev and his brother, Tamerlan Tsarnaev, coordinated the detonation of explosive devices in Boston, which killed, dismembered, or injured dozens of people during the 2013 Boston Marathon. Id. at 2. The government has alleged further that, while in detention but before the imposition of SAMs, Tsarnaev called his mother in Russia, who recorded the call and released portions to the media. Id. at 3.

Unlike Tsarnaev, here the government has not alleged that a change in circumstances justified the SAMs, that Mr. Mohamed has impermissibly contacted anyone outside prison since his arrest and incarceration, or that he has passed messages to the media, either directly or indirectly.

27

The Stewart, Basciano and Tsarnaev cases provide perspective. They show that the government failed to tailor the present SAMs to Mr. Mohamed. Instead, the government imposed boiler-plate measures, which might have made things easier for a bureaucracy but ignored the circumstances of this particular inmate. Because the SAMs here are not prisoner-specific, the Court should vacate or modify them.

**D.      The SAMs are Not Necessary to Avoid Death or Serious Bodily Injury.**

SAMs must be "reasonably necessary to protect persons against the risk of death or serious bodily injury." 24 C.F.R. §501.3(a). The SAMs here are not (see Backg'd, §2. supra). Unlike, for example, Abdel Rahman, U.S. v. Stewart, 590 F.3d 93 (2nd Cir. 2009), or Basciano, In re Basciano, 542 F.3d 950 (2nd Cir. 2008), the government fails to allege that Mr. Mohamed is a leader who can issue orders that he expects outsiders to obey. Unlike those defendants, the government also fails to allege that Mr. Mohamed has engaged in criminal misconduct since his arrest in November 2013. Thus, Mr. Mohamed poses little risk of causing "death or serious bodily injury" without the SAMs. Furthermore, since anyone wanting to commit a crime on Mr. Mohamed's behalf could do so just as easily without the SAMs as with them, they are not "reasonably necessary." In short, since the SAMs lack a factual basis and fail to serve their stated purposes, the Court should vacate or, in the alternative, modify them.

### III.

### THE SAMS ARE UNCONSTITUTIONAL

Pretrial detention serves not to punish but rather to ensure public safety and the defendant's presence at trial. See generally Bell v. Wolfish, 441 U.S. 520 (1979). Pretrial detainees "retain at least those constitutional rights that [the Supreme Court has] held are enjoyed by convicted

prisoners," id. at 545, and their conditions of confinement may not be punitive. Id. at 535 ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against the deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee."); see also City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244 (1983)(the due process rights of a pretrial detainee "are at least as great as the Eighth Amendment protections available to a convicted prisoner."). In addition, when "an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Bell, 441 U.S. at 547.

In Mr. Mohamed's case, the SAMs violate the Constitution without a sufficient justification related to public safety or institutional security.

## A.    The SAMs Thwart the Effective Assistance of Counsel.

Effective assistance of counsel, guaranteed by both the Sixth Amendment and Due Process, is critical during the pre-trial stage. E.g., Maine v. Moulton, 474 U.S. 159, 170 (1985)("[T]o deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself."); Wolfish v. Levi, 573 F.2d 118, 133 (2d Cir. 1978)("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), rev'd on other grounds Bell v. Wolfish, 441 U.S. 520 (1979); Johnson-El v. Schoemehl, 878 F.2d 1043, 1051 (8th Cir. 1989)(when access to counsel "is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised."). The Supreme Court has stated that "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid."

29

Procunier v. Martinez, 416 U.S. 396, 419 (1974), overruled in part on other grounds Thornburgh v.

Abbott, 490 U.S. 401, 419 (1989).

Government-imposed restrictions that interfere with defense counsel's ability to conduct a

meaningful investigation and present a defense are grounds for reversing a criminal conviction. As

explained in Professor LaFave's leading treatise on criminal procedure:

> The "right to the assistance of counsel," the Supreme Court noted in
> Herring v. New York, "has been understood to mean that there can be
> no restrictions upon the function of counsel in defending a criminal
> prosecution in accord with the traditions of the adversary factfinding
> process." Accordingly, state action, whether by statute or trial court
> ruling, that prohibits counsel from making full use of traditional trial
> procedures may be viewed as denying defendant the effective
> assistance of counsel. In considering the constitutionality of such
> "state interference," courts are directed to look to whether the
> interference denied counsel "the opportunity to participate fully and
> fairly in the adversary factfinding process." If the interference had
> that effect, then both the overall performance of counsel apart from
> the interference and the lack of any showing of actual outcome
> prejudice become irrelevant. The interference in itself establishes
> ineffective assistance and requires automatic reversal of the
> defendant's conviction.

Wayne R. LaFave, et al., *Criminal Procedure* §11.8(a)(3d ed. 2012)(citations omitted).

The SAMs here severely impair defense counsel's ability to conduct a meaningful

investigation and prepare a vigorous defense. Each of the following restrictions unconstitutionally

prejudice Mr. Mohamed's Sixth Amendment rights and, therefore, is grounds for the Court to vacate,

or modify, the SAMs.

**1.      Limitation on the "Dissemination" of Communications.**

The SAMs bar anyone except Mr. Mohamed's counsel from "disseminat[ing] the contents

of Mr. Mohamed's communications to third parties . . . ." (Ex. A, §2.d., p. 7; see also Ex. D, at 3-4.)

30

This provision is unconstitutionally vague and overbroad, leaving obscure the meaning of dissemination. Furthermore, this provision limits dissemination to "the sole purpose of preparing the inmate's defense – and not for any other reason." (Ex. A, §2.d., p. 7.) This limitation is also unconstitutionally vague and overbroad, leaving obscure the meaning of "defense."[11]

The "dissemination" of information is inextricably linked to "investigation." Defense counsel seek information from clients and use that information. Investigators, experts and researchers may rely on such information and incorporate it into their inquiries. Fortunately, the USAO seems to agree: "The SAMs provisions barring the forwarding of third-party messages from the defendant do not prevent defense counsel from using information provided by the defendant to develop a defense, including by sharing such information with investigators, researchers, and experts." (Ex. F, at 2.) But the language of the SAMs is unclear. If investigators, experts and researchers cannot disseminate information learned from Mr. Mohamed, they cannot conduct the complete inquiries needed to develop and present a defense and to provide the effective assistance of counsel required by the Sixth Amendment.

The limitation of "dissemination" to Mr. Mohamed's counsel is unreasonable. Counsel cannot personally act as their own investigators, experts and researchers. The offense took place in Niger, which is poor and unstable. The arrest took place in Mali, which is war-torn. Travel to both

---

[11] This limitation (Ex. A, §2.d., p. 7) is also inconsistent with the section governing Legal Mail, which states that counsel "may not send, communicate distribute, or divulge the inmate's mail, or any portion of its contents (legal otherwise), to third parties," without exception (id., §2.i., p. 10). Read together, these two sections allow counsel to share information obtained from Mr. Mohamed in person or by phone "for the purpose of preparing the defense," but prohibit counsel from sharing that very same information by mail under any circumstances for any purpose. Such disparate treatment of information obtained from Mr. Mohamed based on the medium of communication used by counsel is confusing, difficult to follow, and arbitrary and capricious.

countries is unsafe.  Research and investigation may require knowledge of French and Arabic, as well as Tamasheq, Songhai, Hausa, and Zarma – languages beyond the ken of defense counsel. Again, the USAO seems to agree: "[T]he SAMs permit investigators, researchers, and experts to rely on information provided by the defendant, through defense counsel, in conducting interviews or otherwise carrying out their roles in building a defense, so long as that reliance does not become active dissemination of the defendant's communications." (Ex. F, at 2.)  And again, the language of the SAMs remains unclear.

Someone might venture a partial solution for avoiding inadvertent disclosures, namely, segregating information learned from Mr. Mohamed from all other information.  But that solution is impractical, if not simply impossible.  The amount of information in this case is too vast, the ability of the mind to keep straight the origins of all information too weak.  To always err on the side of caution would lure the defense into passivity rather than a zealous defense.

Counsel should not have to forego using valuable information from their own client.  Nor should counsel have to fear that using information, which anywhere else they would use in the normal course, exposes them to sanctions or prosecution for violating the SAMs. See generally U.S. v. Stewart, 686 F.3d 156 (2nd Cir. 2012)(affirming sentence of New York defense attorney Lynne Stewart to ten years in federal prison on charges that included violating SAMs).

In short, the SAMs provisions limiting the dissemination of communications severely impair the defense's ability to prepare a vigorous defense.

### 2.    Undue Restrictions on Defense Team Members.

The SAMs limit contacts with Mr. Mohamed to "precleared staff," defined as "a co-counsel, paralegal, and investigator who is actively assisting the inmate's . . . defense [and] who has

32

submitted to a background check by the FBI and USA/EDNY . . . . " (Ex. A, §2.a. n.2., p. 6; see also Ex. D, at 4.)  But the SAMs lack an express provision for visits by outside experts retained by the defense.

The definition of "precleared staff" is unreasonably restrictive.  It excludes much FDNY staff (who are not co-counsel, paralegals or investigators) as well as outside experts, even if they, too, have "submitted to a background check" and received clearance.  With background checks and clearances in place, there is no rational basis for making these further distinctions among those assisting counsel in the defense.  Even case-by-case permission for visits creates bureaucratic obstacles that unduly burden Mr. Mohamed's Sixth Amendment right to effective assistance of counsel.

The restrictions inherent in the definition of "precleared staff" are even more irrational and contrary to the Sixth Amendment in light of the atypical nature of this case.  It is complex.  It calls for a series of experts and consultants of the kind that no law office would have in-house.  The problems with these restrictions are not merely theoretical.  Arranging a visit of a forensic psychologist, Dr. L. Thomas Kucharski, took more than two months.  Any other expert retained by the defense will surely face similar delays (see generally Ex. T).

In short, the SAMs provisions limiting visits by any members of the defense team burden Mr. Mohamed's Sixth Amendment right to counsel.

### 3.    Irrational Distinctions Among Defense Team Members.

The SAMs permit a precleared paralegal to visit Mr. Mohamed without an attorney but prohibit investigators and any other defense team members from visiting him alone (Ex. A, §§2.e. & f., p. 7; see also Ex. D, at 5).  The government has "designed" these two paragraphs "to limit . .

33

. who may meet alone with the defendant to core members of the defense team" (Ex. F, at 3) – apparently inventing a concept of "core members of the defense team" unknown elsewhere in the law and apparently never similarly handicapping any "core members" of the prosecutorial team. In fact, the SAMs' distinctions among defense team members are arbitrary and capricious.

The Ninth Circuit addressed this very issue. See U.S. v. Mikhel, 552 F.3d 961, 964 (2009). In Mikhel, the Court failed to see "any valid, rational justification for distinguishing between paralegals and investigators employed by the office of the Federal Public Defender." Id. ; see also id. ("In order to be effective in providing investigative services, an investigator often needs to meet with the client."). The Mikhel Court then modified the SAMs to allow Federal Public Defender staff investigators who satisfied the government's preclearance requirements to meet with the defendant without defense counsel. Id. at 964-65. Such a change, the Court found, would not impose any additional burden on the government or otherwise hurt guards, other inmates, or the allocation of prison resources. Id..

There is no more reason to distinguish among defense team members here than in Mikhel. Both paralegals and investigators need preclearance (see §2.a. n.2., p. 6). Once precleared, paralegals and investigators have met the same standards of trustworthiness and have equally fulfilled the purposes of the SAMs. There is no logical reason why an investigator, like a paralegal, cannot meet alone with the defendant. The same point holds for outside experts, whose trustworthiness should be more than sufficient, once pre-cleared, to meet alone with the defendant.

In short, the SAMs provisions that arbitrarily distinguish among those assisting in Mr. Mohamed's defense unduly burden his Sixth Amendment right to counsel.

4.      **Severe Limitations on Legal Phone Calls.**

The SAMs state that precleared defense staff may communicate with Mr. Mohamed by phone, but only when an attorney is physically present and participating in the call (Ex. A, §2.g.i., p. 8; see also Ex. D, at 5).  Furthermore, a translator must be in the same room as the attorney and may not participate through a conference call (Ex. A, §2.b.ii., p. 7; see also Ex. Q).  The MCC has refused to set up regularly scheduled weekly phone calls with Mr. Mohamed on the grounds that "[l]egal calls are considered and provided to inmates on a case-by-case basis." (Ex. Q.)  In practice these provisions prevent phone consultations – an otherwise standard form of attorney-client communication – by creating two virtually insurmountable obstacles.

First, in prohibiting precleared defense staff (whose trustworthiness is assured through preclearance) from communicating alone with Mr. Mohamed by phone, this provision hardens the irrational distinctions among defense team members (see §§III.A.2. & 3. supra).  Second, while allowing Mr. Mohamed to initiate legally privileged phone calls in theory, the SAMs render such phone calls virtually impossible in practice.  Such calls cannot occur because the SAMs insist that the interpreter be physically present with counsel and bar the interpreter from translating a conversation by conference call.  Not surprisingly, FDNY does not have a French or Arabic interpreter either on staff or regularly in the office.

In short, the SAMs provisions that effectively prevent Mr. Mohamed from consulting with counsel by phone unduly burden his Sixth Amendment right to counsel.

5.      **Restrictions on Third-Party Communications.**

The SAMs bar counsel and defense staff from forwarding "third-party messages" and third-party mail to and from Mr. Mohamed (Ex. A, §§2.a. & i., pp. 5-6, 10; see also Ex. D, at 2-3).

These provisions are unconstitutionally vague, leaving the definition of "messages" obscure, and they are unconstitutionally overbroad, barring counsel from conveying innocuous personal information to family members.

For a man in solitary confinement, like Mr. Mohamed, contact with his family is critical for his mental well-being. Counsel is indispensable for helping to maintain that family contact since he is functionally illiterate, his whole family lives abroad in Mali, and phone connections between here and Mali are unreliable and poor.

Since arriving in the U.S., Mr. Mohamed has had little family contact. Counsel has struggled to reach his relatives, and occasionally succeeded, but the SAMs create doubt about what we can say beyond confirming that we have met with him. Can we convey what we otherwise would in the normal course, such as, that he is in good health and spirits, that he wants relatives to deposit money in his commissary account, and that he sends his love and does not want them to worry? Fortunately, the USAO seems to think so (at least as to Mr. Mohamed's parents): "The government does not interpret the provisions concerning third-party messages to preclude defense counsel from sharing observations about the defendant's health, spirits, or general well-being with the defendant's parents." (Ex. F, at 2.) But why should the defense need to bet on their adversary's interpretation? Why shouldn't the SAMs be clear on their face? Why should there ever be any question about simple messages, human messages, like these, which simply alleviate unnecessary worry for inmate and his family alike?[12]

---

[12] In response to the defense letters of September 3 and October 8, 2014 (Exs. H; D, at 8), the government ultimately modified the SAMs in one part, allowing counsel to take dictation of Mr. Mohamed's letters to his family and later providing him the hard copy for mailing (see Ex. C).

36

There is no valid, non-punitive, reason why the SAMs should hinder defense counsel from helping Mr. Mohamed convey to his immediate family personal messages, unrelated to politics. These tasks are essential if counsel is to establish and maintain trust with our client and to watch out for his mental well-being. By unreasonably thwarting such defense efforts, these provisions in the SAMs unduly burden the Sixth Amendment right to counsel.

**B.** **The SAMs Violate Due Process Because They Are Punitive.**

The government may not subject inmates to unnecessarily harsh and isolating conditions of confinement. See e.g. Wilkinson v. Austin, 545 U.S. 209, 223 (2005)(protected liberty interests are implicated where prison regulations impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."). Thus, SAMs are unconstitutional in the absence of a showing that there is a reasonable necessity for their harsh conditions of confinement. See 28 C.F.R. §501.3(a)(requiring SAMs to be "reasonably necessary to protect persons against the risk of death or serious bodily injury."); see generally Human Rights Committee, General Comment 20, Article 7 (44th session, 1992)(prolonged solitary confinement of a detained or imprisoned person may amount to a violation of article 7 of the International Covenant on Civil and Political Rights, which aims to protect both the individual's dignity and physical and mental integrity).

Mr. Mohamed now lives in nearly total isolation. The SAMs prohibit him from even communicating with other inmates (Ex. A, §§6, 7, pp. 14-15). The risks of such extreme solitary confinement for his well-being, for his mental health, for his sanity, are dire (see *Backg'd,* §3. supra).

The risks of Mr. Mohamed's solitary confinement are made worse by SAMs that choke off his ability to communicate with his family. An ocean separating continents renders family visits impossible anyway, but the SAMs make no allowance for family separation in curtailing

correspondence and phone calls with his family (Ex. A, §§3.a.i.; 3.a.i. n.7; 3.f.i.; 3.g.i., pp. 10, 12-13; see also Ex. B).  For example, the SAMs allow only "a minimum of one call per month" (Ex. A, §3.a.ii., p. 10); insist that "[a]rranging for an interpreter/translator may require at least fourteen (14) days advance notice" (Ex. A, §3.b., pp. 10-11); bar more than one letter to one family member per week (Ex. A, §3.g.i., p. 13); and hold on to his incoming mail – which predictably will always be in the common languages of French or Arabic – for up to sixty business days because in a foreign language (Ex. A, §3.g.iv.(2), p. 14).

These severe restrictions are unnecessary or are much more severe than necessary for the purpose they purport to serve (see *Backg'd*, §§2, 3; Ex. D).

In sum, the government has confined Mr. Mohamed to a single cell, barred communication with other inmates, and frustrated family contacts.  Without serving a purpose, or at best disproportionately severe for their purported purpose, the SAMs jeopardize Mr. Mohamed's mental health.  Since they are punitive and violate due process, the Court should vacate or modify them.

## C.    The SAMs Violate the First Amendment.

With their blanket prohibition on non-legal communications with anyone other than immediate family members (Ex. A, §§3.a.i., p. 10; 3.f.i., p. 12; 4., p. 14), the SAMs unduly burden free speech and association rights. E.g., Mohammed v. Holder, 2011 WL 4501959, at *7-10 (D. Colo. 2011)(holding that the inmate's evidence was sufficient for a *prima facie* case that the SAMs that limited his communications to a narrow and specific list of persons violated the First Amendment); Hale v. Ashcroft, 2008 WL 4426095, at *4 (D. Colo. 2008)(SAMs' restrictions on communications with family members clearly "impaired" his "First Amendment interests").  While Mr. Mohamed is not religious (but see Ex. U, at 2), the restrictions in the SAMs on group prayer (see

38

Ex. A, §5.a., p. 14) still infringe upon the free exercise of religion. <u>See e.g.</u>, <u>Reid</u> v. <u>Wiley</u>, 2009 WL 1537879, at *3-7 (D. Colo. 2009)(denying a motion to dismiss a free exercise claim by a prisoner denied group prayer under SAMs).

Since the SAMs here violate Mr. Mohamed's rights to free speech, association, and free exercise of religion, the Court should vacate or modify them.

### Conclusion

For the foregoing reasons, this Court should vacate the SAMs or, in the alternative, vacate them in part and make appropriate modifications.

DATED:     BROOKLYN, N.Y.
              JANUARY 29, 2015

DOUGLAS G. MORRIS, ESQ.
MILDRED WHALEN, ESQ.
FEDERAL DEFENDERS OF NEW YORK, INC.
ONE PIERREPONT PLAZA, 16TH FLOOR
BROOKLYN, N.Y. 11201

ATTORNEYS FOR THE DEFENDANT
ALHASSANE OULD MOHAMED